## PRESTON v. DARCY et al.
### No. 14178.

Court of Appeal of Louisiana. Orleans.
May 30, 1932.

J. A. Woodville, of New Orleans, for appellant.

Legier, McEnerny & Waguespack, of New Orleans, for appellees.

WESTERFIELD, J.

This is a suit by a tenant for damages for personal injuries in the sum of $16,500, alleged to have been occasioned by a fall caused by a defective step attached to the rear of the premises belonging to the defendants.

The case is defended upon the ground that the accident, which is alleged to have caused the injuries upon which this suit is predicated, did not in fact occur, and in the alternative, and in the event that the defendants be held to be negligent, that plaintiff was guilty of contributory negligence barring her recovery.

There was judgment below in favor of defendants dismissing plaintiff's suit, and she has appealed.

The record fails to show upon what ground the trial court based its conclusion, since there are no reasons for judgment in the record.

Taking up the first contention of plaintiff, we find that her case is supported by her daughter, Louise Preston, and by Rosemary Davis, Leona Davis, and Clarence Preston, all of whom claim to have seen the accident, and by Robert Austin, who, though he did not claim to have seen the accident, testified that he drove plaintiff to the Charity Hospital in his automobile immediately thereafter. In addition to those witnesses, Dr. Letton, who attended plaintiff just after the accident is alleged to have happened, testified that he found her terribly shocked and suffering from contusions and bruises around the head and chest; that she was "weak, emaciated and wasted" and unable to get out of her bed until two or three months had elapsed.

Plaintiff, in describing the accident, stated that in coming down the back steps she placed her foot on the bottom step, when it became dislodged causing her to fall, knocking her head and rendering her unconscious; that she was taken to the hospital, a fact which she only learned afterwards, because she was unconscious during the entire trip and only regained consciousness some hours later when she recognized Dr. Letton, who was in attendance, at her bedside; that she had worked for one family for about seventeen years without having been sick except when confined prior to the birth of her children.

On the other hand, Dr. Lyons and Dr. Anderson, who testified in defendant's behalf, could find no evidence of a fall. It is true that they did not see plaintiff until several days after the alleged accident, but when they did see her she was in bed and claimed to be incapacitated by the alleged accident. These two doctors agreed in saying that plaintiff was sick, but attributed her illness to a chronic condition of some sort and were positive that it was not of traumatic origin. In this respect they are in apparent agree-

ment with plaintiff's physician, Dr. Letton, who testified that she was "weak, emaciated and wasted." We find it difficult to believe that a fall which was accompanied with so little apparent effect could cause plaintiff to be bedridden for months and produce weakness and emaciation. Moreover, the story of the visit to the hospital is incredible. In the first place, no record could be found of the visit in the books of the hospital, notwithstanding exhaustive search by Miss McFetridge, a clerk in charge of the records, who testified to that effect. This circumstance in itself is sufficient to create considerable doubt in our minds, because it is a matter of common knowledge that all hospitals, particularly public hospitals, make an especial effort to keep proper records of their patients, and this hospital, according to the testimony in the record, was no exception. Several witnesses connected with it testified that it would have been impossible for plaintiff to have visited the hospital without there being a record made of it, but the statement of those who testified that they accompanied plaintiff to the hospital, which is offered as a possible explanation of the absence of any record of their visit, to the effect that they brought an unconscious woman into the receiving rooms and were allowed to remain there one hour and a half without attention and then told to go home and call in the family physician, is beyond all belief, involving, as it does, very serious reflection upon the management of our Charity Hospital and one which we would be slow to credit without indisputable proof. No hospital, certainly not a public hospital, could justify its neglect of an unconscious woman for one hour and a half when for all any one knew restoration to consciousness, and escape from death itself, depended upon prompt and immediate efforts to resuscitate. The mere announcement that a patient is unconscious should arouse to instant activity all possible agencies designed to relieve such conditions. To wait one hour and a half when each moment is precious, and then decline to give any attention or service to the prostrate woman, is so incompatible with the obvious duty of an eleemosynary institution, whose merciful ministrations in emergencies are a conspicuous feature of its public service and go far to justify the great expense involved in its maintenance as to be incredible. If the management of the Charity Hospital be guilty, as plaintiff charged, then truly it may be said that in this institution the quality of mercy is strained out of all resemblance to "the gentle rain of Heaven."

Our conclusion is that the plaintiff has failed to make out her case, and that the judgment appealed from is correct, and it is therefore affirmed.

Affirmed.